NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNNY KARP INVESTMENTS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> PETER C. KYRIAKOULIS, JOSEPH GROSODONIA, EDWARD C. AYERS, III, VII CAPITAL PARTNERS, LP, VII CAPITAL MANAGEMENT, LLC, VII CAPITAL ADVISORS, LLC, VII CAPITAL GROUP, LLC, JOHN/JANE DOES 1-5, fictitious individuals to be named after discovery, and ABC CORPS. 1-5, fictitious corporate entities to be named after discovery, <br><br> Defendants. | Case No: 19-16644 (SDW) (LDW) <br><br><br> OPINION <br><br><br> March 18, 2020 |

**WIGENTON,** District Judge.

Before this Court is Defendants Peter C. Kyriakoulis ("Kyriakoulis"), Joseph Grosodonia, Edward C. Ayers, III ("Ayers"), VII Capital Partners, LP, VII Capital Management, LLC, VII Capital Advisors, LLC, and VII Capital Group, LLC's (collectively, "Defendants") Motion to Dismiss Plaintiff Johnny Karp Investments, LLC's ("Johnny Karp," or "Plaintiff") Complaint, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated below, Defendants' motion is **GRANTED.**

**I. BACKGROUND AND PROCEDURAL HISTORY**

On October 21, 2010, seven siblings ("Siblings"), including Yvonne Broggi ("Broggi"), and John Karpovich ("Karpovich"), established Johnny Karp, a New Jersey limited liability

company, in order to invest the retirement funds of the Siblings' widowed mother and provide for her. (D.E. 1 ¶¶ 12-15.) Johnny Karp had approximately $1.3 million in assets which were invested with various investment management companies. (*Id.* ¶¶ 19-20.) None of the Siblings are sophisticated investors. (*Id.* ¶¶ 17-18, 44.)

Starting in April 2013, Peter Kyriakoulis met with Broggi and Karpovich about investing Johnny Karp's funds with his company, VII Capital Management and VII Capital Partners (collectively, "VII Capital"). (*Id.* ¶¶ 21, 36.) During these meetings, Broggi and Karpovich told Kyriakoulis they wanted to make "conservative, safe investments," and Kyriakoulis "repeatedly stressed" that under VII Capital's management, "money would not be lost," and that Johnny Karp funds would be "safe." (*Id.* ¶¶ 35-36, 39-41, 43.) Kyriakoulis never mentioned oil futures or other speculative investments. (*Id.* ¶ 42.)

On September 10, 2013, Johnny Karp invested $500,000 with VII Capital, and an additional $75,000 in January 2015. (*Id.* ¶¶ 51-52, 56.)[1] Later in 2015, however, the value of this investment began fluctuating significantly, ending that year at $397,218, hitting $551,093 on January 1, 2016, and then falling to $384,647 on March 31, 2016. (*Id.* ¶¶ 63-68.) On April 1, 2016, Johnny Karp invested another $540,000 with VII Capital, bringing its total investment to $1,115,000. (*Id.* ¶¶ 69, 71.)[2] The investment's value continued to fluctuate between the $800,000s and low $1,000,000s, and on August 31, 2016, reportedly fell to $278,994. (*Id.* ¶¶ 72-76.) Nevertheless, on September 21, 2016, Kyriakoulis emailed Broggi that Johnny Karp's projected account balance for 2016 was $1,542,744, but that "in order to achieve that rate of return, a high degree of volatility is possible, which is what happened in August." (*Id.* ¶¶ 77-78.)

---

[1] Plaintiff technically purchased securities (via limited partnership interests) in VII Capital. This Opinion refers to this as "investing" with VII Capital.
[2] This figure accounts for the total amount Johnny Karp invested into VII Capital, and not the value of the investment at that time (which appeared to be approximately $924,657). This Court notes that Plaintiff erroneously states its total investment was $1,150,000. (*See, e.g.*, D.E. 1 ¶ 71; D.E. 14 at 5.)

On November 21, 2016, Edward Ayers, a member of VII Capital, informed Broggi that the investment was at "approximately $100,000," but they were "targeting about 1 year to recover the assets," and on December 15, 2016, VII Capital again stated that "<u>a full recovery is targeted in the next 8-14 months</u> . . . ." (*Id.* ¶¶ 82-84 (emphasis in original).)

On April 1, 2017, Kyriakoulis reported that Johnny Karp's investment started recovering and, using a monthly 35% rate of return, projected it would be valued at $1,768,182 by the end of the year. (*Id.* ¶¶ 87-88.) On April 4, 2017, he met with several of the Siblings ("April 4 Meeting"), and he attributed the investment's losses to turmoil in the Middle East and pricing decisions made by OPEC, before confirming that the entirety of Johnny Karp's investment was in oil futures. (*Id.* ¶¶ 89-93.) Though "shocked," the Siblings "decided to maintain their investments" because "they saw no other way to recoup their huge losses," and because Kyriakoulis promised that the losses would be recouped by year end. (*Id.* ¶ 94.) The investment continued to fluctuate in the ensuing months, reaching as high as $306,440 before falling again, though VII Capital continued to project significant optimism, a 35% monthly return, and a full recovery by year end. (*Id.* ¶¶ 98-103.)

On August 14, 2017, Kyriakoulis notified the Siblings that Johnny Karp's investment had fallen to $2,210, and that "there is little hope of any meaningful recovery going forward." (*Id.* ¶ 104.) He later explained that VII Capital "held a significant long position in the oil market meaning we would profit if the price went up," but the market fell significantly. (*Id.* ¶ 105.)

Johnny Karp filed the instant nine-count Complaint in this Court on August 13, 2019, alleging violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)") and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5

("Rule 10b-5") (Count 1), and a series of state law claims.[3] (*Id.* ¶¶ 107-179.) On September 26, 2019, Defendants filed the instant partial motion to dismiss the Complaint. (D.E. 10.) Plaintiff opposed on October 21, 2019, and Defendants replied on October 29, 2019. (D.E. 14, 15.)[4]

## II. LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

In considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well-pleaded

---

[3] Specifically, Plaintiff alleges violations of the New Jersey Uniform Securities Act, N.J.S.A. 49:3-47 *et seq.* (Count 2); common law fraud and fraud in the inducement (Count 3); equitable fraud (Count 4); conversion (Count 5); unjust enrichment (Count 6); breach of contract (Count 7); breach of fiduciary duty (Count 8); and for an accounting (Count 9).

[4] Plaintiff's opposition exceeded the page length limit, per Local Rule 7.2; Defendant's reply brief was submitted one day late, per Local Rule 7.1(d)(3). The Court permitted Plaintiff's opposition to remain filed as is. (D.E. 19.) The parties are reminded that compliance with all local rules is required.

facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

### III. DISCUSSION

#### A. Count 1: Section 10(b) of the Securities Exchange Act and Rule 10b-5

Count 1 of the Complaint alleges violations of Section 10(b) and Rule 10b-5. (D.E. 1 ¶¶ 107-25.)[5] Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of SEC rules and regulations. 15 U.S.C. § 78j(b). Rule 10b-5 states that it is unlawful to, "in connection with the purchase or sale of any security," "employ any device, scheme, or artifice to defraud," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or "engage in any act . . . which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. These provisions "establish a private right of action." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir. 2000).

A Section 10(b) claim has six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation"; (5) economic loss; and (6) "loss causation." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).[6] The statute of limitations is the earlier of "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Discovery

---

[5] This Court will refer to these collectively as "Section 10(b)." *See S.E.C. v. Zandford*, 535 U.S. 813, 816 n. 1 (2002) (noting the "scope of Rule 10b-5 is coextensive with coverage for § 10(b)").

[6] Plaintiffs must also satisfy the heightened pleading standard outlined in the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b), and Rule 9(b). *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).

of facts includes "facts the plaintiff already knew," and "facts a reasonably diligent plaintiff would have known." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). Scienter is among the facts which must be discovered before the limitations period starts accruing. *Id*. at 648-49.

Plaintiff's claim is based on two groups of misrepresentations and omissions. (*See* D.E. 14 at 17-19.) First, between 2013 and 2016, Defendants induced Plaintiff to invest $1,115,000 with them by representing that they would put Plaintiff's funds in "safe" investments, when Defendants actually invested the funds entirely in risky oil futures. (*See, e.g.*, D.E. 1 ¶¶ 40-46.) Second, once the investment started losing hundreds of thousands of dollars in 2016, Defendants induced Plaintiff to maintain its investment by making overly optimistic representations on the likelihood of recovery, which they knew were false. (*Id*. ¶¶ 76-78, 82-84, 87, 115-17.)

Initially, Defendants' alleged misrepresentations inducing Plaintiff to maintain its investment are not actionable under Section 10(b), which requires such misrepresentations to be made "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); *see Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 790 (3d Cir. 1982) (noting, because of the "in connection with" language, Section 10(b) liability cannot be predicated on conduct, "no matter how fraudulent or deceptive [it] may have been, that induced [plaintiffs] to 'retain' [] stock"); *VT Inv'rs v. R & D Funding Corp*., 733 F. Supp. 823, 832 (D.N.J. 1990) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38 (1975)).[7] Considering only Defendants' statements which induced Plaintiff to invest with them (i.e., that funds would be placed in safe investments), Plaintiff clearly discovered these were intentional misrepresentations at the April 4 Meeting. (D.E. 1 ¶¶ 90-94.) Therefore, Plaintiff had discovered the facts necessary for its Section 10(b)

---

[7] Plaintiff argues the two groups of misrepresentations make up a "singular fraudulent scheme" and fall under the broad "in connection with" language of the rule. (D.E. 14 at 19-21.) While the misrepresentations inducing Plaintiff to invest are covered, it does not extend liability to representations inducing retention of the investment. *See Walck*, 687 F.2d at 790-91 (limiting consideration to just conduct inducing the plaintiff to purchase securities, and not conduct inducing retention).

claim over two years before the filing of the Complaint on August 13, 2019, and its claim is time barred. *See Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (stating a statute of limitations defense "may be raised on a motion under Rule 12(b)(6)" when the time-bar is "apparent on the face of the complaint") (internal citations and quotation marks omitted)

Even assuming the misrepresentations causing Plaintiff to maintain its investment are actionable, Plaintiff still knew (or a reasonably diligent investor should have known) the facts necessary to make its claim by the April 4 Meeting. First, by April 1, 2017, Plaintiff knew its investment had already lost the vast majority of its value, falling from $1,115,000 to $160,272, with most of the losses occurring between July and November, 2016. (*See* D.E. 1 ¶¶ 71, 75-79, 82, 87 (noting a drop from $886,324 to "approximately $100,000" in November 2016).) Second, Plaintiff knew, in the face of these losses, Defendants still made (in Plaintiff's words) "outrageously optimistic" projections as to the investment's recovery that were "objectively beyond reasonable expectations," given the poor performance of the investment up to that point. (D.E. 14 at 22, 29-30.)[8] And third, understanding both of these facts, Plaintiff then, as discussed, learned that Defendants had misrepresented the "critical fact" that its funds were not in "safe" investments, but rather in risky oil futures. (D.E. 1 ¶¶ 90-94; D.E. 14 at 27-28.) Given these allegations, this Court finds that as of April 4, 2017, Plaintiff had "discovered" the allegedly fraudulent nature of both Defendants' representations inducing it to purchase securities and to maintain its investment.

Plaintiff argues that it only discovered the necessary facts—particularly facts rising to a strong inference of scienter—upon "the complete loss of Johnny Karp's investment" announced

---

[8] Namely, prior to the April 4 Meeting, Defendants represented that the investment was projected to be at an "all-time high," would make a "full recovery," and would achieve a 35% monthly rate of return. (D.E. 1 ¶¶ 77-78, 82, 84, 87-88 (making such representations in September, November, and December 2016, and on April 1, 2017).) After a slight recovery in the beginning of 2017, Defendants continued to make such representations, after April 4th.

on August 14, 2017. (D.E. 14 at 18.) This Court disagrees. First, as to Defendants' representations that they would make "safe" investments, a strong inference of scienter arose at the April 4 Meeting when Defendants revealed they did the exact opposite. *See Merck*, 559 U.S. at 649-50 (noting that showing a speaker made a statement it knew to be false "is normally to show scienter as well"). Second, as to Defendants' representations on the chances of recovery, Plaintiff acknowledged these were "outrageous[]" and "objectively" unreasonable; thus, a reasonable investor would have understood Defendants' statements to be very likely intentionally misrepresented, particularly when Defendants had just admitted to misrepresenting another "crucial fact," and when such representations went directly against the investment's recent historical performance. (D.E. 14 at 22, 29-30); *see Merck*, 559 U.S. at 649-50; *McCullough v. Advest, Inc.*, 754 F. App'x 109, 112-13 (3d Cir. 2018) (finding a defendant's "intent to deceive was further established by the disparity between his continually positive assessment" of the investment and the investment's "falling stock prices," where facts suggested defendant had information indicating inaccuracy of his statements).[9]

This Court finds that Plaintiff "discovered" the facts making up its Section 10(b) claim, including its basis for alleging a strong inference of scienter, by April 4, 2017, and well before the complete loss of the investment.[10] Therefore, Plaintiff's Section 10(b) claim is time-barred.

### B. Plaintiff's Remaining State Claims (Counts 2-9)

---

[9] The *Merck* Court notes that in the Section 10(b) context, an "incorrect prediction about a firm's future earnings, by itself" is not sufficient to show scienter since it may be due to "innocent [] error." 559 U.S. at 650. This is not the case here, where sophisticated managers (Defendants) made multiple, objectively unreasonable predictions about an inherently volatile investment which had already been performing incredibly poorly, and which was to remain invested in exactly the same way—facts Plaintiff knew after the April 4 Meeting.

[10] For the purposes of the statute of limitations analysis, this Court will assume—without deciding—that Plaintiff sufficiently alleges scienter. Notably, Plaintiff primarily argues that the "false assurances of safe, conservative investments," Defendants' investment into oil futures, and Defendants' "outrageously optimistic promises of recoupment" allege scienter. (D.E. 14 at 29-30.) As discussed, Plaintiff had discovered the truth behind these representations by April 4, 2017. While Plaintiff also points to the complete loss of the investment as the triggering fact for discovery of scienter, is it unclear why, particularly when the vast majority of the investment was already lost by the end of 2016.

The "exercise of supplemental jurisdiction is a matter of discretion," and having dismissed the claim upon which federal jurisdiction rests (Count 1), the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. (Counts 2-9). *See Angeloni v. Diocese of Scranton*, 135 F. App'x 510, 514-15 (3d Cir. 2005); *VT Inv'rs*, 733 F. Supp. at 843.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED**. An appropriate Order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:      Clerk
cc:        Leda Dunn Wettre, U.S.M.J.
           Parties